The court next will hear argument in Appeal No. 05-1492, Festo Corp v. SMC Corp. Mr. Hoffman, good morning. Welcome back. I must say, for my own part, that I admire the stamina of the counsel in this case that has gone on for so many years, about a decade and a half, and in the Supreme Court, I guess, twice already, and in this court numerous times, and in front of the trial court two or three times, and I don't know if we're at the end of the road yet, but I certainly admire the dedication of counsel for both parties. Please proceed. We're here in return from the remand that the district court enlisted in regard to the presumption of foreseeability and the obligation of Festo to overcome that, and we had a hearing before Judge Saris, who originally was the trial judge in the jury trial, and the result was we presented several experts testifying as to the test required, which was the foreseeability at the time of the amendment, which was 1981. Okay. Now, before you get into the merits of that precise issue, just help me understand the context. There was a jury verdict of infringement under the Doctrine of Equivalence and an award of damages way back. Right. Now, as of the start of the hearing in front of Judge Saris in the most recent litigation round, what happened to that judgment of liability and those damages? Had they already been vacated, or did her ruling in this latest round effectively vacate that award? No, the remand was for the purpose of determining whether the verdict should be reinstated. So it had already been set aside? Yes. It had been affirmed initially on appeal before this court. Right. And then after the first round, it went to the Supreme Court, coming back, and then it was the en banc decision. It was vacated. So the judgment of liability and damages was vacated by us, en banc, the last time we had this case? Yes. Okay, so long gone before it gets back to Judge Saris. So all she had to decide was the foreseeability of two particular claim limitations. That's correct. All right. And the remand was limited to overcoming the presumption by being unforeseen. So it was one aspect of the Supreme Court. Right. So you had the burden of proving that neither of these features of the accused product would have been a foreseeable variation of the underlying technology as of 1981. That's correct. And you put on two witnesses, and essentially you say we carried our burden of proof and the judge misfound the fact. Well, the judge made a very good statement as to what the law is as set forth by the Supreme Court and by this court and the remand, and then proceeded to listen to the testimony and then decide on the basis primarily of hindsight as to finding a map of what was known at the time. That's the problem I'm having here. You talk about hindsight. You seem to equate foreseeability with obviousness. And what you're saying, if I understand it, is that at the time of the amendment, that using the aluminum sleeve in less than two seals was not obvious, therefore it wasn't foreseeable. But it seems to me that's exactly the wrong test. That's not the test for the court. Well, it certainly sounds like it. You talk about hindsight. I mean, it sounds like your experts are saying, boy, at the time that this amendment was made, nobody would have thought of using an aluminum sleeve or fewer than two seals with two guidelines, and therefore we ought to be able to capture this new invention within the scope of our claims under the Doctrine of Equivalence. And I would have thought that that was exactly what you weren't allowed to do under the Doctrine of Equivalence, was to capture somebody else's invention. No, it wasn't the test. The test that we established the proof in was whether it was foreseeable in 1981, whether it was foreseeable. Oh, I understand that. But you were saying it wasn't foreseeable because it was novel. It was new. Nobody would have thought of it at the time. If it was novel and new at the time, and non-obvious at the time of the application in 1981, why should you be able to capture that new invention, that non-obvious variant of this, under the Doctrine of Equivalence? Well, under the Doctrine of Equivalence, at the time, if something wasn't foreseeable and you're claiming your invention, you're claiming all the equivalence with it. Now, if that wasn't a known equivalent at the time, you're excused from not claiming that. You know, you can overcome the presumption by there's nothing that would be expected Did you agree that you can't capture under the Doctrine of Equivalence some additional invention beyond what was claimed at the time? I mean, isn't the purpose to give people obvious variants of what... I'm sorry, I'm sorry. I'm trying to answer the question. I mean, isn't the purpose of the Doctrine of Equivalence to give people obvious variants of what they literally claimed so that the full scope of their invention is preserved? Yes, well, you're entitled to whatever equivalence there are. I'm trying to answer my question specifically. Is that not the purpose of the Doctrine of Equivalence, to give them obvious variations of what they invented so they get the full scope of the invention even though they didn't write it that way? I don't know about the word obvious, but you're entitled to the variations as long as they're You think that you ought to be able to capture non-obvious variants of the invention, things that were non-obvious at the time that the application was filed? It's not a question of obviousness. It's a question of... Well, what's the answer to the question? Are you arguing that you can capture something that was non-obvious at the time? Well, if it wasn't known at the time, it was not known, or the teaching was not there for that, and later on it's determined that that's an insubstantial change at the time of infringement, and it still falls within the invention, you're entitled to it. So is the answer that you are entitled to capture something which was non-obvious at the time of the original invention? Well, you're entitled to capture equivalents as long as it's an equivalent. Is the answer that you are entitled, in your view, to capture something which was non-obvious? I'm not sure I understand the question, because... Well, you understand obviousness, right? I understand obviousness. Okay, so they write an application, they claim things, they describe the invention, and if they can't capture some other invention other than the one they described, right? No. Right, so they have to limit themselves to things that were obvious over what they specifically claimed. It's not obvious. It's not an obviousness test. Why not? Whether or not it's an equivalent, whether the subject matter is equivalent. If it's not a known equivalent, and it's not perceivable, it's not perceivable, the equivalent is not perceivable at the time, because the known technology doesn't make it perceivable. At some later time, it can become perceivable. Now, this can be because it's later developed technology, or use of... Yeah, but what sounds to me as though you're saying is that later on, at the time of the infringement, something becomes an acknowledged part of the art, and that you can capture it because it's insubstantially different from what was originally claimed under the Doctrine of Equivalence, without regard, you say, without regard to whether that invention was obvious or non-obvious at the time of the original application. I find that difficult to understand. Well... Mr. Ando, let me interrupt, because we are exhausting your time. I have to say, of course, there's no telling what this Court will ultimately decide as to how the law should evolve. But I agree with the way you have stated it, that if, in fact, some new evolution in conducting one phase of a process, for instance, was not known as a new invention, and was not permitted the capture of that as an equivalent. Now, I don't think that that issue is in this case, because one of the points that Judge Saras stressed was that the, for instance, the alloy, the non-magnetizable sleeves, and so on, were, in fact, in the prior art. So we can't say that this was a later development. Now, whether such a sleeve might capture the small amount of magnetic flux which was present, I think is a different issue from the one that Judge Dyke has raised. Now, a lot of people have thought that it is counterintuitive that the Supreme Court seems to permit capturing as equivalent because of an equivalent function, something that might be performed in an unforeseen way. But do you agree that that issue, perhaps, is not in this case, as the facts were presented to and found by Judge Saras? The fact of whether or not an aluminum sleeve existed at the time? We know it existed. Well, at least the alloy existed. The aluminum alloy sleeve existed at the time. However, the knowledge and the foreseeability that that aluminum alloy sleeve could shield leakage fields was not known. And, you know, we proved that, and Judge Saras agreed with that. But when Judge Saras said the flux was so small that it wasn't that aluminum could shield a very strong magnetic flux of the large gap, as you stressed, or how it was affected by the gap. But the fact that the aluminum sleeve could be used, I gather, was known. Well, then it becomes a problem, because for purposes of infringement, we were required to show a substantial amount of shielding, which we did, 300 percent shielding, the volume of aluminum sleeve that the defendant used. And we did that at trial. And that was required for our proof of infringement. Now you're saying we should go back to the foreseeability area and not have that requirement that it be known that that will shield. Now, the shielding amount shouldn't really matter. The question is whether it shields or not. And it was not known to shield at all. Now, whether you could make some other product that didn't shield leakage fields, which are always there. They never disappear. You always have leakage fields when you're dealing, especially with these rare earth magnets. In that case, I think the strongest argument in support of Judge Saras' view is that, in fact, the claims were amended to include the magnetizable limitation. Right. And doesn't that, even under established old law of Foulwrap or Estoppel, shouldn't that end it, whether or not it's equivalent? No, because we still have to establish the equivalency of the sleeve in question used in the claim invention, which is not an aggregate, but a proper arrangement of parts. And it had to shield. Therefore, it had to be foreseeable at the time it would shield. Otherwise, it was unforeseeable at the time, and we overcome the presumption because it wasn't known. Well, why should it be? So why should you be required to include that in the claim? Because it was there initially, and the claim was amended. And without knowing, without the public knowing why that amendment was made, whether it was an accident or a mistake or based on prior art or anything else, it was done. That's correct. To me, that is the strongest issue. And normally, that would be in Estoppel because the amendment was made. So you'd be stopped to have an equivalent. So the question that the Supreme Court has raised, well, if that particular equivalent in question, the one in question, was not foreseeable at the time of the amendment, then you don't have an Estoppel. And our position was that it wasn't foreseeable to use that sleeve to shield, which was required to shield the flux fields. And therefore, that was not an equivalent which was estopped by the amendment. But the problem is we have to, in this case, decide what foreseeability means. And reading your experts and listening to you, you seem to say that foreseeable means novel, new, non-obvious, and that you can't do it in terms of hindsight, completely without regard to whether the particular variant here could have been known at the time that the application was filed. Obviously, we have to give some meaning to foreseeability. The question is what meaning do we give to it? Do we give it a broad meaning and look at it in terms of novelty? Or do we give it a narrow meaning and say that, well, even something which is not foreseeable, it doesn't give you the right to capture something which is novel as of the time of the original invention? Well, look at it this way. Do you understand what I'm saying? I understand you do. Now, if the choice was made to include that limitation in the claim, so the choice was made according to what was required for proof of equivalency, was that there was shielding done by that sleeve, okay? Once that choice was made, then you have to go back and look and see if an aluminum alloy sleeve, was it foreseeable as that would be an equivalent, that that could shield? And at the time, all the technology, the text and everything else said no. What you're arguing is that it's not foreseeable because it's novel and new and nobody knew about it at the time, which would seem to be directly contrary to what you're supposed to be looking at in connection with the doctrine of equivalence. That's the problem on that. Well, I think the test is more that when you draft your claim, if you're expected to know what the equivalents are, or at least what your claim covers when you make the amendment to the claim, you're held to that. What's known to a man skilled in the art, you're held to that. But you're not held to things that aren't known that later turn out to be equivalents as well, when the teachings were to the opposite. Why should you be held to that? And that's what the Supreme Court is saying. And whether it was developed at a because they both fall in the category of unforeseeable. So the man drafting the claim was unforeseeable, that that was a choice. And so, you know, the Supreme Court is saying that in that case, you wouldn't expect him to cover that, if he was concerned in covering that. Isn't the real point what the amendment should say? The situation is that the examiner has not allowed the claims as originally drafted. Therefore, the prosecutor has a choice. I can either appeal and hope the board will agree with me and say the examiner was wrong, or I better narrow the claims and try to convince the examiner to allow claims as so narrowed by amendment, right? Well, that's one reason why you narrow claims. You might just do it because you want to do that, because the claim... Yeah, but that's not what happened here. Okay. These claims had to be narrowed. No, they didn't. There was no prior art rejection. There was no, there is no prior art that had any bearing on the claims, either before or after amendment. That was, there was only one 12 rejection, and that was it. So there was never a prior art rejection in this case. And so... Well, whether there was a prior art rejection or any other kind of rejection, the situation of the applicant in this case was, you're not going to get your claims unless you narrow them. So he narrowed them. And as I understand the test that the Supreme Court has given us in Festo, in making a narrowing amendment, the amender should be careful because he should know that he's going to give up everything between the original claim and the narrowed unless there was no way he could protect himself by having a less restrictive amendment. So in this case, the question is whether the claim amender could have thought of something other than adding the limitation magnetizable, which would overcome the rejection, but leave a broader scope in the claims. And so then the question seems to me to be, well, if aluminum sleeves were known in this art before, then the amender was on notice that he better not use the word magnetizable as his amendment because aluminum is not magnetizable. So he's going to exclude coverage of aluminum even though he knows that that's already being used in this art. Now, I don't understand how you get around that problem. It seems to me Judge Sarris is correct. It's known in the art, therefore it was foreseeable. Whatever else foreseeable might mean, it has to mean he could have protected himself by a different amendment than adding the word magnetizable to the word sleeve. It wasn't known in the art, and Judge Sarris agreed. It was not known in the art that the aluminum sleeve... Well, why not? The aluminum sleeve was known in the art. But the fact that the aluminum sleeve could shield magnetic fields was not known. Okay, but where is it in the claim anything about the function? Well, that's definitely... This is not a means plus function claim. This is a structure claim. And so the amendment added a further definition of structure. So the basic structure is the sleeve, and now we're going to restrict the claim to a sleeve that's magnetizable, which means it's made out of a kind of metal that is magnetizable. Some are, some aren't. And at trial we went through all this, and if you want to understand what that means, what magnetizable material, you look at the specification, you read it in light of the law, it requires that it shield magnetic fields to reduce leakage. But that's not a claim limitation. Yes, it is. It was part of the claim. It was required for infringement. Yeah, but the function isn't. It just has to be magnetizable. If the metal's magnetizable, it fits the claim. If the metal's not magnetizable, it doesn't fit the claim. If it did not shield leakage fields, we would not have had an equivalent at the trial, the some other invention, some other structure, something different. What happened here, what was selected was a particular combination to achieve certain results. And you had to show the equivalent acted in the same way to get the same result. You're assuming that the drafter had to know that aluminum would function, even though it's non-magnetizable, similarly to a metal that is magnetizable. But I'm questioning that assumption that you're making. It seems to me that since the function isn't spelled out in the claim, that it's not true that the amender would have to know the magnetic properties of aluminum alloy. You're saying that the different claim is foreseeability than for infringement, and I don't think that's the proper way to do it. I'm understanding Kennedy to say you lose everything between original claim and amended claim unless you couldn't protect yourself because the thing that you needed to cover wasn't even known then. But here it was known, you could have protected yourself with a different claim. But at the time you were selecting magnetizable shield for purposes of shielding. If you were doing that, you made a claim selection. And we were limited to that trial. If they came in with a wood slate that was something that had no shielding, we would not have prevailed the trial. Did you present this on the Doctrine of Equivalence under the function-of-weight result test? Yes, we did. And was the argument that the function was to shield it from magnetic field? One of the functions, there's a number of functions in that outer sleeve. It's to hold components together and it's to be as a guard again. It's to redirect, to create a magnetic circuit, to redirect the field existing space around these magnets. And so it's redirecting those so they don't extend outwardly and attract surrounding metallic parts and interfere with the operation of the system. And you're saying that at the time people didn't know that aluminum would do that? Aluminum alloy, they did not know that that would do that, no. Right. Didn't know that. And the judge found it and that our experts were able to establish that based on the text, based upon the knowledge at the time, based upon the patent. At the time, in 1981, that was not known. But then she went on to say, like Judge Michelle is saying, well, why don't you have some other design? It really isn't that important to have the leakage fields in some instances shielded. So why don't you have some other design? Design something different. Well, that isn't what the invention was in the context of the invention and what was done in the prosecution and what the determination of And I can't see why we should be subjected to a different invention here than was done for purposes of equivalency trial. Well, the short answer is because the Supreme Court invented some new law and we're all stuck with it. And you couldn't have foreseen that. We couldn't have foreseen it either. I understand. But now we have this foreseeability test and we have to apply it even though it sort of gives you a headache to try to reason your way through this case from beginning to end. I agree with you that it seems very convoluted at this late date, but I think we're stuck with it. Yeah, I agree. It's a difficult thing. It's new law and new interpretation of law. So it is difficult. And believe me, it was a difficult thing to wrestle and try and understand it as I understand it and do what we thought we had to do in our case here. And there was no rebuttal evidence of any sort? Is that right? No, rebuttal evidence was in the form of statements made at the original trial when there were statements of the experts about the infringement question. But there was no rebuttal expert put on. No live testimony? No live testimony. And did Judge Saris rely on the portions of the trial record that the SMC lawyers put in? Yes, she did. She relied on that. And I don't think that was correct because they were talking about infringement at that time. They were not talking about the facility, the foreseeability in 1981. So it's hard to, you know, we had to talk before the foresee. We had to trial before we had this style of question. So it's kind of a unique situation because we were the first case really to have this. She essentially ruled that you failed to carry your burden of proof, as I understand it. You put in a lot of evidence. It just wasn't quite enough. It was sort of a rough translation of her conclusion. Right. And her analysis was that basically we should have had different data. We should have had empirical data of the patent, which is not possible. Or we should have taken data of the infringing product, which didn't even exist in 1981, and try and get some data. You know, she's substituting what she thinks she needs or what the experts think they need. You have people with 100 years experience together in this area, and they're saying these are the things we look at in 1981 with our expertise in this area. This is what we believe was known at the time. She's the fact finder. She's entitled under her fact finding powers to disregard the testimony and money of somebody, even if he's the biggest expert in the world. That's the legal system for better or for worse. But she should have some basis to do that. Well, one of the reasons that she rejected the testimony is that she thought there was an inconsistency here. I mean, at the time of the original trial, you said this is a trivial variation to have an aluminum sleeve. And now when you come in on the foreseeability point, your experts are saying, well, that was at the time of infringement. Now we're looking at the time that the patent was originally filed. And this is an enormously different thing. So it wasn't foreseeable. It still may be a trivial thing. It just wasn't foreseeable at the time. It's still shielded. But they seem to think that this is the sort of thing that would be patentable, separately patentable. Well, I don't think that was ever the understanding. I think it was their testimony did not address that. I think their testimony addressed the fact it was directed at a man skilled in the field that they wanted. He was trying to design this product. What would he know? What wouldn't he know? What was available to him? Show me where in these affidavits they say that it was a trivial variation. I don't think they ever said it was a trivial variation. Well, I thought you just said that they said in the affidavits that it was a trivial variation from what was contained in the original application. No, they never said that. No, they said the opposite. They said it was a really substantially different thing than what was claimed in the original application. No, they said it was something that was unforeseeable at the time to a man skilled in the art. That was unforeseeable. But the unforeseeable thing is the magnetic impact of aluminum alloy. That's the only thing that, as I understand it, that was unforeseeable. Right? That's correct, because that was... And you're saying that's decisive. If you looked at all the texts, everywhere, that was known at the time, and you will see the same thing, that you can't, you don't use an aluminum alloy if you want to shield magnetic fields. So, you know, how can you say that was foreseeable at the time? Certainly the aluminum alloy was foreseeable, because aluminum alloys were around. Aluminum alloys were there. As sleeves for these kind of devices. As sleeves, as housings. I mean, they were around for housings. Okay? And the same thing with a ring. I mean, a sealing ring. I mean, a sealing ring was around probably thousands of years. Let me ask you something different. She seemed to find fault with the proof as insufficient on this issue of large gap versus small gap devices. And I think she was having a little trouble understanding that. And I, you know, she recognized that there was a difference in small gap and large gap devices. However, she didn't understand the magnitude of how you determine the magnitude of it, how you determine a device is a large gap or small gap device. Were there demonstrative exhibits here? Were there videos? Were there models presented to the court? What's the underlying evidence here that would help one understand the difference between a large gap device and a small gap device as to the difference in where the magnetic field goes? How much shielding would be needed? Well, there were certainly exhibits very carefully as to how you, in a small gap device, what you have to shield and where it is. In the demonstrative, we had a whole PowerPoint and actually moving parts and so forth was shown. So, we had a whole presentation on that. Do we have that here? Do we have that PowerPoint presentation you used below? We have slides from the PowerPoint presentation. In the appendix, there are slides from the PowerPoint presentation. The way I understood Judge Sarris' concern for the data that she was asking for was she understood that but for the change, the improved power, the increased power of magnets, this would not have been needed or available, that the size of the gap would not have been as significant, that the whole threshold really was the availability of these very powerful magnets after 1981 or after Dr. Stoll initially did his work. My sense was, from her complaints about the absence of data measuring their device and the gap and the changes, I have a feeling that she was thinking that maybe because of the advancement of science, these really were changes that flowed from advancement of science that the Festo inventors had nothing to do with. Did you get that sense from her concerns? Yeah, I think somehow she wanted a measurement of that and it's hard to do. You know, where the advancements were, what was the change between 1981 and 1987 or 1988 when the infringing product came about, okay? So, what was, she wanted to get some kind of a handle. That's difficult to do and that's a problem with this foreseeable test because, you know, obviously technology moves forward. Magnets get stronger, different types of tube materials are used, all kinds of things happen and when you're developing products like these rodless cylinders, I mean, it took eight years for Dr. Stoll to originally come up with one of these, the first one with these magnets that actually was commercial. You know, we thought it took a long time and his progress is in the prior rod patents that are in the case, his initial attempts. So, there wasn't a lot of odd in working with these. But couldn't you have quantified the difference in magnet strength between 1981 and 1988? She seemed very upset that there was, that Dr. Wolf testified that the later magnets were much stronger or far stronger or some such phraseology but with no quantification. The thing to me would have been quite simple to be able to compare the 81 magnets in strength against the 88, 1988 magnets and quantify it and maybe not down to some hundredth of a unit but still quantify it versus just the verbalization much stronger. Well, I mean, obviously you can do, I mean, an expert has a decision to make, what he needs to do to come up with an opinion. Jack Starris may have felt she needed more proofs of certain types. Some of them I don't think were valid because she was trying to compare… No, I'm on a very specific point. I'm just talking about relative magnet strength over a seven-year gap in time. Was that in dispute? Did the other side challenge the increased strength? No. But she found, as I understand it, she found your proof on this and several other points insufficient because not quantified. So then the question I have is, well, was it too difficult or infeasible to quantify? And it seems to me that at least on magnet strength it would be quite easy to quantify at least to some degree. Right? Don't you agree with this? It may be but it may not be particular to the patent because the patent doesn't define what magnets necessarily are being used or what the strength is. No, no, no. So you could take other magnets that were around at the time but whether they were usable in this device or not is another question. Well, you could have taken Dr. Stoll's own device's magnets and compared them with the apparently stronger magnets about ten years later. Well, there was nothing in the record, nothing there Dr. Stoll had. It was in 1981 and we knew what's in the patent. That's all we know. We don't know what it was. So you have to guess at that. You could say, well, these magnets are being sold at that time. What about the torsional moment problem? Yes. I grappled with that for a while. Okay. Well, apparently there was a deficiency of proof on that also in her view. In her view, yes, because it wasn't a deficiency of proof. It was that she felt Dr. Wolf gave a contrary testimony at the trial. Well, he did. I mean, I think we have to all candidly admit that his testimony was quite different at trial from here to the point Judge Dike has been making over and over. I don't think he conflicted on this point. I don't agree with you on that. I think that at trial, he had to prove certain things for infringement, okay, at the time of the infringing product, okay, and he had to prove that the rings white-guarded and sealed, okay, and that was part of the claim requirements. When he went back to do the test on foreseeability, he had to look whether or not this one ring instead of two or three rings instead of four was something that was foreseeable at that time, and the patent teaches to the contrary, every piece of prior art teaches to the contrary, and there's no suggestion that you can have an asymmetrical arrangement of rings and have an operable device. Well, what would teach away from that? Why wouldn't it be perfectly operable? It wouldn't wipe quite as well as if you had two two-way rings, but one two-way ring would still wipe, and that's all that's required. Yeah, but not for foreseeability, because what you got is, you've got the torsion requirement. You have to, the torsion thing says, at the time, you were taught not to do that. A man skilled in the art was taught not to do that. Not to do what? Not to have aligned rings, because his magnets were very strong, and you had a powerful torsion effect, and you had a destruction of the two. So, it was understood at that time that an asymmetrical arrangement of rings was not a feasible choice or a foreseeable choice. Okay? That was understood in 1981. That was the understanding of man skilled in the art. Now, at the time, they, in fact, the infringer's product had always the four rings, until they were sued, and then they pulled the ring off one end. Okay? Designing around is an approved tactic. So, if they correctly designed around, they're okay. If they didn't, they're infringers. This is a common dilemma we see all the time. So, at the time, now they took that chance at that time by doing that, and they were able to get it to work. At least, maybe inferiorly, but it got it to work. What about the thickness of the two? To the extent that this torsion problem is something to be overcome in the design of these devices, isn't there the option of overcoming it by having either a stronger or a thicker tube wall? Well, there's some difficulty there, because the whole context of the invention in the past, and what Dr. Stiller was working on, was to overcome these large gap devices that did not have the proper coupling effect to be effective in this type of a product. So, he got the thinnest possible walls he could use, maybe like a soda can or something, in order to make the coupling forces stronger and stronger. Now, of course, when you do that, you don't have the resistance to the deformation forces. So, you're limited, and the way to solve that is to align your rings, so that you can use a thin wall tube, and you can also maintain no deformation problem. So, the question of whether you could go to a thicker wall, like the large gap devices, or the materials, or the relative magnets, that was up in the air at that time, and it wasn't foreseeable that you could avoid this torsion problem if you went to a thin wall tube. A thick wall tube. If you went to a thick... I'm sorry. If you went to a thick wall tube. Right. Don't you see a bit of a conflict here in suggesting that the foreseeability test ought to focus on the novelty of what's being done here, so that you can capture something by the doctrine of equivalent, which no one skilled in the art would have thought about at the time? Is that... I mean, how can that be? No, it's a matter of foreseeability. Okay? It's a matter of foreseeability. You keep saying that, but I'm asking you... The test is. Yes, it is. But the question is, what does the test mean? And you're arguing that the test means the more that someone skilled in the art would have not have foreseen this, the greater the novelty of it, the more likely it is that it's not foreseeable, and that we ought to be able to capture it under the doctrine of equivalent. That, it seems to me, runs exactly counter to what the doctrine of equivalence is supposed to capture. That's the problem with your interpretation of foreseeability. Well, I don't necessarily agree with that. But I think that what you're trying to do is to understand what the man skilled in the art, what he was aware of at the time, when he made his claims and claimed his invention, what he was aware of. And if a particular form of the invention is unforeseeable, he still should be permitted to get the benefit of that at the time of infringement. As I recall, the first... Going back this decade, the evidence at the trial, the jury trial, on equivalency was the classical test of substantially the same function may result. Not substantially the same structure, although a good deal of that was conspicuous, but directed to function may result. And my sense as to try and focus on what the Supreme Court was doing is that you can have equivalency, but if the structure by which it was achieved was not foreseeable, if it was achieved in a different way, you could still capture it under equivalency. So that the test now is a different one. And that I, too, in reading, because I thought Judge Saras was very thorough, but I also too got the impression that this concept we all really have trouble understanding the purpose. But we see what it is, and I think it's very hard to argue with what the Supreme Court actually did achieve. If you could foresee it, even if it's a different structure, you should put it in your patent application. And if you couldn't foresee it, how can we say you should have put it in the patent application? I can see how, of course, the facts of this case, the differences are perhaps modest enough so that one can argue as a matter of fact, not as a matter of law, whether something was or wasn't foreseeable. But is that your sense of how it evolved? Yes, I think so. We've given you a lot of extra time. We'll restore some rebuttal time. Let's hear now from Mr. Newstown. Thank you, Your Honor. The test here results from narrowing. They originally had a claim that was broad enough to cover the magnetizable sleeve and the non-magnetizable sleeve. They then narrowed that claim down so it only covered magnetizable. Namely, if you use non-magnetizable, you're no longer within that claim. Because they couldn't foresee that a non-magnetizable sleeve would absorb the flux. So maybe it's not quite as simple as I had initially thought. Maybe it's not just you can't recover from this estoppel. Well, the Supreme Court dealt with that. And at the trial on remand, it turned out that the evidence from the previous trial was that there wasn't any magnetic leakage. And that you didn't need a magnetizable sleeve because there wasn't any leakage. And both sleeves would work just as well. And the FESTO knew that, and therefore they wanted to cover a non-magnetizable sleeve. I thought that there was small leakage. I never thought there was no leakage. No. FESTO at the trial, in order to prove equivalence, says there is absolutely no leakage. And Stoll testified there is absolutely no leakage up there. We designed it so that there's no leakage up there. And that is the testimony I can refer to as at page 14 of our brief. That's very interesting because the specification, there'd be no reason to write a contrary specification. The specification says that the sleeve absorbs the flux. Yes, but Stoll then at trial said, even though the specification says that, he designed his device, and everyone designs these devices, so that there is no flux up there. And therefore it doesn't matter whether you use a magnetizable or a non-magnetizable sleeve, because there is no flux there, they're going to work exactly the same. Therefore, with the evolution of science, they should be equivalent. Well, here you get to the narrowing of claims, and the public's need to be able to rely upon what is claimed. FESTO originally had a claim that was broad enough to cover both. And in response to a 35 U.S.C. 112 rejection, which was a patentability rejection, he ended up with a claim that was restricted to a magnetizable sleeve. You're saying he should be absolutely stopped, whether or not evolution in the structure and power of the magnets and the other factors might have changed the demands of the device. This is what the court held in bond, that narrowing like that means that you can't go back and get from the claims what you purposely excluded. But the Supreme Court didn't even say that. They said maybe you can if it was not foreseeable. Yes, that's why the Supreme Court changed the decision. This court held in 99 in bond that that narrowing was a bar, that you could no longer come back and get it. The Supreme Court then said, but maybe there is one situation where you can come back and get it. Three, actually. Well, three, your point. But only one relevant here. Only one in this case. The Supreme Court said claims are important. The public has to rely on it. But if the patentee has a good excuse as to why he can now get back what he gave up, we'll listen to that excuse. And the foreseeability excuse was no one in there, no one would have thought that you could use a magnetizable sleeve in this invention. But then you are saying that the foreseeability excuse would never apply if you narrowed the claim. No, not true. That's an exception to the narrowing of the claims. The Supreme Court said when you narrow claims, there is a presumption running against you, but you can try to rebut it. And to rebut the presumption, what you have to do is show us a reason why if you wanted that protection, you didn't claim it. What does foreseeability mean? What's the test for? The test for foreseeability is really a claiming test. Can you tell the foreseeability test when you read what it comes from? The Supreme Court says a patentee may overcome that presumption by showing that at the time of the amendment, one skilled in the arts could not reasonably be expected to have drafted a claim. That's what the foreseeability test is. Tell me what it means. Does it mean that someone would not have seen using an aluminum sleeve at the time for shielding from impinging magnetic fields? Does it mean that? Does it mean that they wouldn't have foreseen this variant of the invention at the time? That's pretty close to what it means, yes. It means that if you know that you can do this with either a magnetizable sleeve or a non-magnetizable sleeve, then you shouldn't restrict your claim because... Yeah, but we're not talking about that situation here. We're talking about one in which the use of an aluminum sleeve wasn't known at the time, wasn't something that someone skilled in the art would have understood. In other words, do you agree with Festo that the more you show that this was a novel solution to this, the more you are able to show that it wasn't foreseeable? Or does foreseeability have to be a trivial change that wasn't foreseeable, an insubstantial change that wasn't foreseeable? Perhaps the best way to express the foreseeability test that I get is... No, but what's the answer there? Do you have to show that, for foreseeability purposes, that it is nonetheless an insubstantial or trivial change, one that wasn't foreseeable but that was also trivial? You have to show that people knew enough... No, no, no. What's the answer to my question? Well, if you do something different and it's not your invention, obviously you can't get a patent. All right, so does showing that it wasn't foreseeable, does it also have to be a merely trivial or insubstantial change? It doesn't relate to that. The foreseeability relates to, did you know that people in the field might adopt this? And since you consider that part of your invention, therefore you should claim it. So that's what the foreseeability test is. The foreseeability test is, if you wanted this protection, why didn't you claim it? In the facts of this case, what had happened was that Stoll said in his application, this is from what Ted Starr had said, that he knew at the time of his application that you could either use magnetizable or non-magnetizable. And if you know at the time of your application that you can use either, you have a responsibility to claim both. And if you don't claim both and you narrow down to one, you're held to what you chose. And that's really the essence of the foreseeability test. The foreseeability test is the test by Justice Kennedy, which is that if you wanted to cover that, why didn't you claim it? And this all relates to the public notice. The public is entitled to rely upon the claim. So the Supreme Court says, if you narrowed your claim, because previously you had broadened and narrowed, you can't go all the way back and get what you gave up. It sounds to me as though you're getting yourself into trouble. Because once you say that foreseeable is something that someone skilled in the art wouldn't have known about at the time, that's significantly different, or not foreseeable is something that's significantly different, they have a pretty good argument here that their experts have shown that the use of the aluminum sleeve and the single seal here was not something that someone skilled in the art would have thought about at the time. It was something new. It was a new invention. That was just, Joe Sarris said just the opposite of that. And the testimony at the 1994 trial was just the opposite of that. And of course, these are her factual findings which are entitled to deference. She said, and that Stoll said in his patent, that you can do this either with magnetizable or non-magnetizable. So he knew that either could work. And then he, in his patent, restricted it to magnetizable. But he didn't know about aluminum. He couldn't. Because nobody understood that it would perform this function at the time. It never did perform the function. There was, though, Joe Sarris' holding, because she went through the 1994 trial, Sestak tried to prove infringement at the 1994 trial, not by showing that aluminum performed this function, but that there was no flux up there and the function did not need to be performed. The Stoll testimony was, we designed this so that that field is internal to those two magnets. It never gets up to the sleeve. His testimony and Schroeder's testimony, the magnetics expert, was that you don't need a sleeve at all. It doesn't matter whether it's magnetizable or non-magnetizable. And when I pushed Schroeder at trial, I said, well, what happens if you have flux up there? And he said, well, you never have flux up there. And I said, well, what happens if you do? And he said, well, then you have to redesign the device because it doesn't work. They showed equivalence at trial by showing that there wasn't any need to shield, and therefore it didn't matter what sort of shield you had. And that was the proof at trial, and that's why Joe Sarris said the test is, if you wanted coverage on that, why didn't you claim that? And the only way they could get around that is by saying they didn't know about it. And Joe Sarris pointed into the 1994 trial. She said, well, at that trial, he said you did know about it, and you knew about it at the time. Wait a minute. The it is a pronoun, and you're using it, I think, to refer to two different things. Judge Steig is certainly correct that the shielding qualities of aluminum alloy sleeves was not known in 81, right? No one called aluminum shielded. That's correct. That's what I never did show. We all agree on that. Yes. Okay. Okay. The other it you're referring to is whether there was anything there to shield, anything that needed shielding. Correct. And in the 94 trial, the thrust of the evidence was there's no problem of leakage, and therefore there's no need for shielding by the sleeve. Correct. Now, it seems to me that whether there's a need for it or not might not be the central issue. The central issue might be whether an aluminum alloy sleeve is capable of shielding where there is a need.  It's not known to be capable. It was capable as later discovered, but not known at the time to be capable. It was not capable. It was not capable. And the Festo expert… An aluminum alloy sleeve cannot do any shielding? It did not do any shielding that is all comparable to the shielding you get with a magnetizable sleeve. It's just non-magnetizable. Festo's proof at the 94 trial that the aluminum sleeve achieved the same result in the same way was the fact that since you didn't have to do any shielding up there, it worked the same way because there wasn't any flux up there. It didn't matter what sort of shield that you had. But I thought it was agreed that aluminum did provide some shielding. No. Not now? No. I thought the evidence was that there were impurities in the standard aluminum alloy and that there was a small amount of shielding capability, not because of the aluminum, but because of the nature of the alloy. Well, they just said that we have a minimal amount. They said that because of impurities, maybe there's something magnetic in there, but there was never any assertion that that magnetic had any effect that it could shield a significant field. My recollection was that there was so little need for shielding that whatever there was in the aluminum was adequate. No. Their testimony was that there wasn't any field up there because it was specifically designed so that there wouldn't be a field up there. And if there was any field up there, it was completely de minimis. This was in our brief at pages 14 to 15 where we asked the inventor. Here's what he said. He says, it's such a small field, but it does not interfere. Then he says, the field is so little that you actually don't feel it. That's what we learned between 80 and 74. This is told to the inventor. And then he says, question, you said that this leakage field was so small that you don't even need a magnetizable sleeve at all. Is that correct? The stolen inventor then said, correct. Then if you go to the appendix at A1397, this is Festo's pre-trial brief. And this is what Festo told Judge Saris, the stolen who he testified to. It is possible to use a magnetizable sleeve or a non-magnetizable sleeve, and the device will work. No matter which sleeve material is chosen. In fact, he, Stoll, will point out in his patent where this is made clear. In other words, this knowledge relates back to the time of patent. And he says, the choice of the sleeve material is merely a matter of personal selection. Both would work. It didn't matter which you chose. And Judge Saris said, following Judge Kennedy's rule, that if you know that both will work and you only claim one, you can't get protection on the other one. But did you argue at the original trial that they were wrong? That one of the functions that had to be performed here was shielding from stray magnetic field? I did. Yeah? I did. I figured you'd go, I love the patent. And so the test from the Supreme Court is, if you wanted this protection, why didn't you claim it? And that test has to be satisfied by saying, in effect, well, no one knew. And of course, since Stoll said in his application that you can do it with one or both, and then he narrows his claim to one, he chose that for his protection. If he wanted to, maybe he could have pushed for more. But once he limits his claim, then the public relies upon that claim. And that's just the way that you determine it. So this foreseeability exception was something created by the Supreme Court to sort of save patentee if, for some reason, a very unusual reason, he could not be expected to have drafted a claim that would have covered the accused opponent. How did they prove equivalent to the single seal at the original trial? They said their patent said that the two were single. They said that their patent said that they're equivalent. And the SNC shouldn't have used that. They just said when you use two seals or one seal, they all work the same. They said, and I think this was just Michelle's comment, that maybe if you only use one seal, it may not work as well, but it'll still work. Which then gets you down to the fundamental question that if you want to cover both one seal and two seals, you have a responsibility to put in your claim something that is going to cover both because the public. That sounds like a Johnson & Johnson argument about surrender. Well, it is a surrender. It is a surrender. It exactly is a surrender because in the comment that Michelle made with respect to it. Well, that was rejected at the original trial. Did you argue surrender at the original trial? Certainly did. And you lost. I lost, yes. I re-argued that until it blew in the face. But they said one seal, two seals, it really doesn't matter. And this is why that 94 trial just sunk Festo here because of the 94 trial. And they said, sure, we know about this. And SNC should know about this. And they should have used this because we said in our patent they were equivalent, even though they narrowed their claims. They were getting coverage. Then this court said when you narrow your claim for purposes of patentability, you can't go back. But their argument is that the original trial, we were talking about equivalence at the time of the infringement. And we were showing insubstantial differences at that time, whereas now the inquiry under foreseeability is different. It's from the point of view of what was known at the time of the amendment. And as far as these changes are concerned from the time of amendment, this is not something that someone skilled in the art would have understood at the time. Now, the problem with that was because the evidence at trial showed exactly the opposite. Stoll said that we designed it, which meant before his application, 1874, we knew that there wasn't any field up there. So Stoll said they knew, even before his application and before the time of the amendment, that there wasn't any field up there. And therefore, you could use a magnetizable or a non-magnetizable sleeve. And then at trial, they did the same thing with respect to the one sealing ring. And they said, our patent says that it doesn't matter which you use. And the patent, of course, is at the time of the amendment. Stoll had a patent, a prior art patent, that showed both the aluminum sleeve and it showed the single two-way sealing ring. So he knew they could be used. So using the Supreme Court's test, if you knew that they could be used, then, therefore, you should claim them and not narrow your claims to exclude them. And this is what this court said in Sesto 9 when you said, even if the alleged equivalent, you say, indeed, if the alleged equivalent, magnetizable sleeve, two-way sealing ring, were known in the prior art in the field of the invention, exactly what we have here, it certainly should have been foreseeable at the time of the amendment. And that's exactly what Judge Harris relied on. She found that Stoll knew about both of these things. They were both part of the prior art in the field of the invention at the time of the amendment. And, therefore, since they excluded them from their claim and the public is entitled to rely upon their claim, they cannot rebut the presumption. And Harris made very detailed factual findings. These go by the clearly erroneous standard. And she made that finding. There really wasn't much question there. Now, the magnetizable sleeve limitation was added by the narrowing amendment to overcome the 112-6 rejection, right? Well, yes. But the limitation involving two sealing rings was not the subject of an amendment. That was in the claims as originally submitted, right? No. It was a narrowing. It was a narrowing. And this court specifically held in the in bond decision that that was a narrowing. They started off with a 35 UNC 112 paragraph 6 claim, which covered a lot more. And then they narrowed it down to having two sealing rings, one on each end of the piston. So both requiring that the sleeve be magnetizable and that there be a pair of sealing rings were both added by amendment. Well, you could say that. But to state more precisely, originally they had a broad claim which covered that and covered other things. And then they narrowed it down to that. I know for sure that the word magnetizable was added by an amendment. Correct. So there was a narrowing amendment that directly dealt with whether the sleeve was going to be magnetizable or not. Correct. Now I'm asking you to walk me through the same analysis with respect to two sealing rings as opposed to only one sealing ring. Yes. That also was done. By an amendment? By an amendment, yes. It was the same amendment, too. The same amendment also added the word a pair of, phrase a pair of. Yes. So that it became a pair of sealing rings rather than just a sealing ring? Yes. No. Well, what he said is true. But you have to know 35 U.S.C. 112, Paragraph 6. This is the way this court did it in the In Bond Procedure. It didn't say a sealing ring that was changed to two, did it? Oh, no. Well, I think he was referring to the change. The new claim specifically recited the two sealing rings. As opposed to being silent. No. In the presence of. It didn't say a sealing ring and then say, No, there are two. Well, let me go to the path. Yes, the question is, what did the original claim say with respect to sealing rings? The original claim said, Paragraph 112, Paragraph 6, just said sealing rings. So it would have covered everything. If Festo says something is an equivalent, then under 112, Paragraph 6. We don't know whether it would have covered everything. It would have covered what's in the specification and equivalents. Exactly. Your answer is much more precise and much more accurate than mine. That's correct. And Festo did assert at that time. Judge, it was clearly correct. The original claim language did not connote one sealing ring versus some other number of sealing rings. And therefore, when you compare the original claim with the amended claim, you don't go from one to two. You go from sealing means to a pair of sealing rings. That's correct. But the Supreme Court test and this court's test is narrower. And that's exactly what happened. Well, whether that's right or not, isn't that water over the dam at this point? Didn't we hold in the original Festo that it was a narrowing amendment? Absolutely. In fact, you wouldn't have gotten it. And that's not being relitigated here. That's quite correct. The Supreme Court litigated it. They vacated it. No, your answer is quite correct. You're never getting to the Festo presumption unless you have a narrowing. The effect is certainly narrow. It was a narrowing. You go from sealing means to a pair of sealing rings. That certainly is not broadening. And it's not the same scope. It's a narrower scope. Correct. So clearly, it's a narrowing amendment. We're only quibbling about what the original language was versus what the final language was. Correct. It removes the equivalence, because the pair of sealing rings was what was shown in the specification. Yes, exactly. So instead of sealing means, it means a pair of sealing rings and equivalence. Exactly. So you put the pair of sealing rings in the claim. You no longer have the flexibility, the scope, the means plus function, but you don't have a disclaimer of anything with respect to one two-way sealing ring. That was an addition. It wasn't mentioned in the specification. Yes, you have to narrow it. Correct. But again, the Supreme Court's rule is that the narrowing amendment works a total surrender of everything and anything between the original scope and the amended scope unless. Exactly. And then we get into unless it's unforeseen. Exactly. Exactly. And the prior law didn't necessarily involve total surrender. Correct. Although the bond holding said total surrender, and that was modified by the Supreme Court. As to the comment about very powerful magnets, Stoll himself said he was the one when he made his invention to, in effect, first use the very powerful magnets. So it wasn't that powerful magnets were developed later. The powerful magnets had been developed earlier, and that's what Stoll was using. And on no rebuttal evidence, we have all of this perfect testimony from the 94th trial, which perfectly satisfied  And so there was no need for us to call an expert witness. Mr. Eustice, Judge Steich referred earlier to affidavits, and you are referring to testimony from the 1994 trial. Did we have both new affidavits and old trial testimony before Judge Sarris? You had new trial testimony, by testimony. No, I'm talking about the rebuttal evidence. Was your rebuttal evidence limited to 1994 trial transcripts as opposed to newly developed affidavits? Yes. And in fact, that was because at the 94th trial, they talked about events that occurred in 1980, because when Stoll, the inventor, talked about designing the device so that it didn't have I'm just trying to understand what the form of the evidence was. The evidence was two Stoll witnesses, and then we cross-examined them, although we, in our case in chief, introduced that 94th trial testimony. Now, what about the large gap, small gap theory? When Wolf got on the stand, it started with this large gap, small gap. He was trying to figure out, he was testifying completely contrary to what he testified to at the 94th trial. And he said, well, even though Festo used the magnetizable sleeve, and they used the two witnesses, and they used it in 1977 prior to the amendment, he said that was a large gap device, and ours was a small gap device. And he was trying to nullify the prior art. But it was clear that in this field, they had done these things. He was trying to say it was a different field. He was trying to say, well, that's a different field, even though it's a rod with cylinder, and it works exactly the same way. And then the trial judge rejected that distinction. That's correct. That's correct. Was there some testimony in terms of what you introduced that would support the conclusion that it's really the same field, whether the gap is large or small or in between? Well, the inventor was working in this field. The sleeve, of course, didn't matter what the gap was. When you have a gap, it's supposedly to protect the flux from getting out. And the testimony of trial was there was no way the flux could possibly get out. And as their expert told me, if the flux did get out, you'd have to redesign the device. So that had nothing to do with large gap, small gap. And for the large gap, small gap in the torsional deformation, their expert just got up. He had no evidence or anything. He was testifying exactly contrary to the text. Was it Wolfe or Rushrod? It was Wolfe. He was testifying exactly contrary to the 1994 trial. And Judge Sarris just said flat out, I don't believe you. It doesn't work that way. It doesn't work this way. And he never measured anything. He just took his prior testimony, testified just to the opposite, with absolutely no proof. To the opposite in what respect? Well, first, in the 1994 trial, he says one seal, two seal, worked just fine. Doesn't make a difference. He said they were equivalent. He was testifying about equivalency at the trial, not foreseeability, equivalency. Well, that's true. That's quite true. But he said also at the trial, not only are they equivalent, but I told you in my patent they were equivalent. This is what Wolfe said at the first trial, that he said in his patent, at the time of the amendment, that these two devices were equivalent. And at the revamp trial, he's faced with this testimony where he said that Estow knew, back at the time of the amendment, that the two were equivalent. And the question is, if he knew they were equivalent, why didn't he have them replaced? Because now he was talking about foreseeability.